## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jean Grover,                                      Civil No. 09-3282 (SRN/FLN)

        Plaintiff,

    v.                                      **MEMORANDUM OPINION**
                             **AND ORDER**

Smarte Carte, Inc.,
a Minnesota corporation,

        Defendants.

---

Dorene R. Sarnoski, Dorene R. Sarnoski Law Office, 333 Washington Avenue North, 402 union Plaza, Minneapolis, Minnesota 55401, for Plaintiff.

Kurt J. Erickson and Nora R. Kaitfors, Jackson Lewis LLP, 225 South Sixth Street, Suite 3850, Minneapolis, Minnesota 55402; Thomas E. Marshall, Engelmeier & Umanah, P.A., 12 South 6th Street, Suite 1230, Minneapolis, Minnesota 55402, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 15]. For the reasons stated below, this Court denies Defendant's Motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jean Grover alleges that she was discriminated against because of her gender while she was an employee of Defendant Smarte Carte, Inc. Specifically, Grover alleges that she was paid less than similarly situated male employees and that she was overlooked for career- and compensation-enhancing opportunities that were ultimately

awarded to male employees.  Grover also alleges that she was fired in retaliation for complaining about her unequal treatment.

Smarte Carte is a Minnesota-based international retailer of rentable luggage carts, lockers, and strollers.  Smarte Carte's products are available in airports, theme parks, ski resorts, and retail establishments.  Smarte Carte's principal revenue stream comes from its airport luggage-cart business.  Smarte Carte has had a tumultuous corporate history; Smarte Carte has changed hands multiple times in the last twenty-five years and filed for bankruptcy in February 2005.  (Rudis Decl. ¶ 3.)

Grover worked for Smarte Carte from 1994 to 2007.  Grover started out as a sales representative and, through a series of promotions over the years, eventually rose to the level of vice president.  Grover earned salary increases along with her various promotions.  From 1999 until her termination in 2007, Grover was Vice President of Business Development and Operations of Smarte Carte's domestic locker and retail business.  (Erickson Decl. Ex. 2.)  Grover also testified that, in addition to the domestic market, she was responsible for business development in Canada, parts of Europe, and other international locations.  (Grover Dep. at 105, 181-82; Grover Aff. ¶¶ 15, 20.) Grover's focus was the development and growth of the company's stroller and locker product lines in the retail (or non-airport) market.  (Grover Dep. at 66-67, 98.)

Before September 1999, Grover was supervised by then-CEO Brad Stanius.  Most,

if not all, of Grover's promotions occurred during Stanius's tenure.[1]  In 2000, Edward Rudis succeeded Stanius as CEO.

The record shows that Grover was quite successful during her tenure with Smarte Carte.  Under her leadership, sales attributable to the locker and retail division accounted for between 15.2% and 18.6% of Smarte Carte's total sales.[2]  (Rudis Dep., Ex. 1 at 8.)  Grover was routinely praised for her negotiation skills and her ability to land large contracts for the company.  Grover's reviews appear to have been largely positive, although Rudis noted on several occasions that Grover had difficulty relating to her co-workers.  (See Grover Dep. at 153-56.)  Specifically, in Grover's review for 2003 (which she received in early 2004), Rudis stated that he was "concerned about [Grover's] ability to resolve issues with her peers."  (Id. at 156.)

On May 28, 2004, Grover responded to the 2003 review in a memorandum to Rudis.  (Rudis Dep., Ex. 13.)  Grover complained that the negative comments in her review stemmed from a "biased power base" among management from which she was excluded.  Grover asserted that she was increasingly unable to work with her peers and superiors because their bias against her undercut her ability to communicate effectively.

_____

[1] There is a dispute as to whether Grover was "promoted" sometime in 2001 or whether she was only given a change in pay.  (Pl.'s Opp'n Mem. at 11-12.)  The pay change increased Grover's base pay, but eliminated her ability to earn commissions. Grover contends that her overall pay decreased as a result of this change.  (Id. at 12.)

[2] Airport locker sales decreased significantly after September 11, 2001, due to heightened airport security measures.  (See Rudis Dep. at 18-19; id., Ex. 13 at 1.)  Grover drove sales back to pre-September 11 levels by 2007.  (Id., Ex. 1 at 8.)

(Id. at 1.)  Grover specifically noted that "senior management perceive [her] comments, directives and recommendations differently than those voiced by [her] peers."  (Id.)  Grover also complained that she was underpaid vis-a-vis her male peers:  "I have expressed my concern about compensation vs. demonstrated performance and responsibility compared to my peers a few times to you over the last year.  These concerns remain un-addressed."  (Id.)  Grover then compared her compensation and responsibilities to those of one of her alleged comparators, Arthur Spring, and requested a response.  (Id. at 1-2.)  At the time, Arthur Spring was Vice President of Carts and Lockers–International.  (Erickson Decl., Ex. 2 at 4.)  It is not clear from the record whether Rudis ever responded formally to Grover's memorandum.

On June 9, 2004, Grover sent Rudis a follow-up memorandum again outlining her perceived unequal treatment.  (Rudis Dep., Ex. 13 at 3-4.)  She attached various graphs showing her performance from 1996 to 2003 and her perceived unfavorable compensation as compared with that of Arthur Spring.  (Id. at 5-8.)  Again, the record is unclear as to whether or how Rudis responded to Grover's memorandum.

In March 2005, Grover met with Rudis to discuss a new bonus plan that she felt treated her unfairly by providing for similar bonuses to the airport line of business for reaching a lower sales threshold.  (Grover Aff., Ex 2 at 5.)  Rudis told her that he would discuss the matter with the company's Chief Financial Officer.  (Id.)

On April 15, 2005, Grover again met with Rudis to discuss her concern that she was being compensated unfairly.  (Id. at 214-16.)  On April 23, 2005, Rudis responded to

4

Grover's complaints of unequal pay in writing.  (Rudis Dep., Ex. 14.)  Rudis first

dismissed Grover's assertion that she was unfairly paid less than her male peers:  "I

continue to believe that your current compensation including base salary and bonus plan

is in line with your level of responsibility within the organization."  (Id.)  Rudis stated,

however, that Grover would be offered additional incentives in the form of deferred

salary and stock options, which were "intended to recognize [Grover's] contribution to

the growth of new business for Smarte Carte."[3]  (Id.)  Rudis then rejected Grover's

request for a promotion to senior vice president without explanation:  "I do want to keep

your title as an officer in the company as that of Vice President."  (Id.)  Rudis ended the

letter by stating that he "did not wish to discuss the matter any further" and that if Grover

was still unsatisfied, she should "look outside at other opportunities that might better

serve [her] financial and career needs."  (Id.)

On January 12, 2006, Grover's review for 2005 indicated that her job was in

jeopardy due to her "struggle with managing interpersonal relationships with peers."

(Rudis Dep., Ex. 15.)

Throughout 2006 and 2007, Grover continued to formally complain to Rudis about

her unequal pay and her belief that she was treated less respectfully than her male peers

and that her decisions were actively undermined by senior management.  (See Grover Aff.

¶¶ 22-26.)  On May 8, 2007, Grover again met with Rudis to discuss these issues and

---

[3] Between 2006 and 2007, Grover received a total of $1.4 million for her stock
options and in deferred compensation.  (Grover Dep. at 226.)

again provided documentation supporting her belief that she was paid less than her male peers and that she was treated with less respect and given less autonomy than her male peers.  (Grover Aff. ¶¶ 25-26; id., Ex. 1; Grover Dep. at 251-52.)

On May 31, 2007, Smarte Carte terminated Grover without cause.  (Grover Dep., Ex. 18.)  Rudis told Grover that she was being discharged due to a reduction in force, but it is not clear from the record whether other employees were fired along with Grover.  It does appear, however, that Grover's position was not filled and that her responsibilities were rolled into an existing position.  (See Sarnoski Decl., Ex. H at 2.)

On February 22, 2008, Grover filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), charging Smarte Carte with violating the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), et seq., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), et seq.  (Erickson Decl., Ex. 1.)  Grover's EEOC complaint states that the discrimination took place between February 14, 2004 and May 30, 2007.  (Id.)  After receiving evidence from both parties, the EEOC issued Grover a right-to-sue letter.

On November 19, 2009, Grover filed the present case, again claiming violations under the EPA and Title VII and for retaliation.  [Doc. No. 1.]  Grover also brought claims under the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01, 363A.15.  In October 2010, the parties stipulated to the dismissal of Grover's state-law claims.

Smarte Carte now moves for summary judgment, arguing that there are no genuine issues of material fact as to whether Smarte Carte discriminated or retaliated against

Grover.

## II.     DISCUSSION

## A.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party bears the burden of showing that the material facts in the case are

undisputed.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Whisenhunt v. SW Bell

Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986);  Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009);

Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may

not rest on mere allegations or denials, but must show through the presentation of

admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Davenport v. Univ. of Ark. Bd. of

Trustees, 553 F.3d 1110, 1113 (8th Cir.2009) (citing Anderson, 477 U.S. at 247–49).

## B.     Equal Pay Act Claim

To establish a prima facie case under the EPA, Grover must show that Smarte

Carte paid her less than similarly situated male employees for equal work in jobs that

required equal skill, effort, and responsibility and that were performed under similar

working conditions.  29 U.S.C. § 206(d)(1); Taylor v. White, 321 F.3d 710, 715 (8th Cir.

2003).  If Grover meets this burden, Smarte Carte must show that the pay differential was based on a factor other than gender.  Id. at 716; 29 U.S.C. § 206(d)(1).  Smarte Carte argues that Grover's EPA claim fails because Grover's male peers were not paid more than she was and were not similarly situated to her.

## 1.    Unequal Pay

The threshold issue is whether Grover was paid less that her alleged comparators, Johnny Chiu and Arthur Spring.  The records support Grover's contention that she was paid less in guaranteed pay than either comparator from 2002 through her termination in 2007.  (Pl.'s Opp'n Mem. at 6; Grover Dep., Ex. 2; Sarnoski Decl., Exs. A-C.)  Although the parties' numbers do not square exactly, the exhibits show that for each year from 2002 forward, Grover received less in guaranteed pay (base salary and commission, and retention bonus) than at least one of her comparators.  (See Carr Decl., Ex. C; Sarnoski Decl., Exs. A-C.)  Moreover, Grover's base pay was substantially less than either Chiu's or Spring's for each of those years.  For example, in 2005, Grover's base pay was $163,523, while Chiu's base pay was $211,150 and Spring's was $300,515.  (See id.)

Smarte Carte argues, however, that the Court must look at Grover's "aggregate" compensation between 2002 and 2007 to determine whether she was paid less than her male peers.  Under this approach, Grover's overall compensation appears greater than that of her comparators.  The difference, however, is due solely to Grover's receipt of nearly

$1.4 million for her stock options in 2006 and 2007.[4]  (Def's. Supp. Mem. at 8-9; Rudis Dep., Ex. 1.)

Smarte Carte's aggregate approach finds no support in the law.  Smarte Carte has pointed to no case standing for the proposition that courts must consider multiple years of compensation in the aggregate when considering the merits of an EPA claim.  Smarte Carte relies on Mitchell v. Diversified Realty Corp., No. 4:09-CV-224, 2010 WL 3855547, *5 (E.D. Tex. Sept. 8, 2010), for that proposition, but Mitchell centered on compensation earned in a single year and thus does not support Smarte Carte's aggregate approach.  Indeed, if the Court were to adopt the approach urged by Smarte Carte, employers would be free to underpay certain employees for years, but then escape liability by issuing equalizing compensation.  Similarly, an employer could escape liability by underpaying a female employee, who nevertheless is paid the same in the aggregate because she makes up the difference in commissions through her own hard work.  This is not, and should not be, the law.

In sum, Grover has established a prima facie case that she was paid less than her alleged male counterparts, Chiu and Spring.

### 2.    Propriety of Comparators

The next issue is whether Chiu and Spring are proper comparators.  As explained above, to establish a prima facie case, Grover must identify male employees who were

---

[4] Grover testified that she is not basing her EPA claim on the amount she received from stock options.  (Grover Dep. at 226-27.)

paid more for equal work in jobs that required equal skill, effort, and responsibility and that were performed under similar working conditions.  Taylor, 321 F.3d at 715.  Grover has identified Johnny Chiu and Arthur Spring as her comparators.  The positions of Grover's comparators need not be identical to be considered equal under the EPA. Krenik v. County of Le Sueur, 47 F.3d 953, 961 (8th Cir. 1995).  Furthermore, job titles and classifications are not dispositive; it is the actual requirements of the jobs that control. Tenkku v. Normandy Bank, 348 F.3d 737, 741 (8th Cir. 2003).  Whether the compared jobs are "substantially equal requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as level of experience, training, education, ability, effort, and responsibility."  Renstrom v. Nash Finch Co., 787 F. Supp. 2d 961, 967 (D. Minn. 2011) (Schiltz, J.) (quoting Lawrence v. CNF Transp., Inc., 340 F.3d 486, 492 (8th Cir. 2003)).  "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable."  Id. (citing 29 C.F.R. § 1620.14(a)).

Grover and Smarte Carte have submitted conflicting evidence regarding whether Grover and Chui and/or Spring were similarly situated.

### a.      Johnny Chiu

Chui joined Smarte Carte in August 2000 as Vice President of Business Development and Domestic Airport Operations.  In this role, Chiu was responsible for business development relating to Smarte Carte's domestic airport cart and locker businesses.  (Rudis Decl. ¶ 8.)  Beginning in 2003, Chiu was also responsible for Smarte

Carte's locker operations in China.  (Id. ¶¶ 8-9, 12-13.)  Rudis promoted Chiu to Senior

Vice President of Business Development and Operations in 2004.  Chiu retained that

position until he left Smarte Carte in May 2005.

It is not clear how or even whether Chiu's responsibilities changed along with his

promotion.  It is clear, though, that Chiu's promotion did not put him in a position of

authority over Grover.  In fact, Smarte Carte's organizational chart show that Grover and

Chiu occupied similar roles within the company, both before and after Chiu's promotion.

(Erickson Decl., Ex. 2 at 1, 2.)  Both Grover and Chiu were responsible for business lines;

Grover was responsible for the domestic locker business and Chiu was responsible for the

domestic cart business.  (Id.)  Smarte Carte argues that Chiu's role within the company

was much more substantial because he was responsible for the company's primary source

of revenue (carts) and because he was responsible for the development of business in

China.  Indeed, Rudis testified that Chiu was promoted to Senior Vice President because

of his work in China.  (Rudis Dep. at 53.)

Grover counters such allegations by pointing to Rudis's testimony that Chiu was

not responsible for actually developing business in China:  "Johnny's role [in China] was

to help travel with our engineering staff to China, go in and meet factories, function as an

interpreter, and really help our people who had never been to China before, navigate their

way around."  (Id. at 74.)  The Court notes that Grover also had international

responsibilities in Canada, parts of Europe, and Hong Kong, but she did not rise to the

level of Senior Vice President as a result of those added responsibilities.  Additionally,

Grover counters Smarte Carte's contention that Chiu's domestic work was worthy of greater compensation by pointing to evidence that the predominance of the domestic cart business (which Grover alleged she built up prior to Chiu's arrival) declined under Chiu's supervision.  (Rudis Dep. at 51.)  In other words, Chiu's area of responsibility decreased, while Grover's area of responsibility increased.  (See id.)

In summary, there are genuine issues of material fact surrounding the question of whether Grover and Chiu performed substantially equal work for Smarte Carte.  They held distinct positions, but a jury may well deem those positions to be equivalent for compensation purposes.

"To establish a prima facie case, a plaintiff need only demonstrate that the jobs at issue are substantially similar; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent."  Arrington v. Cobb County, 139 F.3d 865, 876 (11th Cir. 1998). Grover has met her burden as to Chiu.

### b.     Arthur Spring

Grover's second comparator, Arthur Spring, was hired by Rudis in April 2001 as a vice president responsible for European business operations and development.  (Rudis Dep. at 66-67; Sarnoski Decl., Ex. C at 1.)  Spring was based in Paris, France, and was technically employed by a subsidiary of Smarte Carte (Smarte Carte France SAS), which appears to have been created for the sole purpose of administering Spring's payroll. (Sarnoski Ex. C at 9-10.)  According to Grover, Spring's job duties mirrored her own:

12

development and implementation of the company's business strategy, leading the

European business line, building client relationships, negotiating contracts, and pursuing

expansion opportunities.  (Grover Aff. ¶¶ 15-10.)  Yet Spring was paid more than Grover.

In 2006, Smarte Carte relocated Spring to the United States and promoted him to

Senior Vice President of Business Development and International Operations.  Aside

from his relocation, it is unclear that Spring's job duties changed along with his

promotion.

Smarte Carte argues that Spring cannot serve as a comparator in this case because

from 2001 through 2006 Spring was employed by Smarte Carte France SAS, whereas

Grover worked for Smarte Carte, Inc.  Smarte Carte also argues that Spring cannot serve

as a comparator because he was based in France, whereas Grover was based in

Minnesota.

The EPA is expressly limited to employees working in the same "establishment."

29 U.S.C. § 206(d)(1).  "Establishment" has been defined by regulation as:

> a distinct physical place of business rather than to an entire business or
> "enterprise" which may include several separate places of business.
> Accordingly, each physically separate place of business is ordinarily
> considered a separate establishment.

29 C.F.R. § 1620.9(a).  However, courts have recognized that there are circumstances

under which separate locations within an organization may be deemed one

"establishment" for purposes of the EPA.  Specifically, courts consider whether there is

central control of job descriptions, salary administration, and assignment of job functions.

See, e.g., Brennan v. Goose Creek Consol. Ind. Sch. Dist., 519 F.2d 53, 57-58 (5th Cir. 1975) (holding that different schools within school district were the same establishment because of centralized hiring, pay determinations, and work schedules); Mulhall v. Advance Sec., Inc., 19 F.3d 586, 592 (11th Cir. 1994) (reversing district court's determination that there was no single establishment due to comparators' different work locations because of the centralized control exerted by the employer); Brownlee v. Gay & Taylor, Inc., 642 F. Supp. 347, 352 (D. Kan. 1986) ("where central supervision exists and where pay standards apply for an entire business entity regardless of where the employee is located, individuals should be compared on the basis of their employment function and not geographic location."); Vickers v. Int'l Baking Co., No. 398CV1864D, 2000 WL 1804612, at *5  (N.D. Tex. Dec. 7, 2000) (determining that "[m]anagerial employees . . . who work under the superintendence of a single supervisor, perform similar work, and are employed by the same corporation can naturally be considered to be working in the same establishment as their peers for the purposes of comparing unequal salaries under the EPA.").

Here, given that Spring and Grover both reported to Rudis and both performed similar work for Smarte Carte, Inc., a reasonable trier of fact could infer that a single establishment exists for purposes of the EPA.  The fact that Spring was technically employed by a French subsidiary for a portion of the relevant time period does not alter the analysis at this juncture.  Even while employed by the company's French subsidiary, Spring reported to Rudis, CEO of Smarte Carte, Inc., his pay was determined by Smarte

14

Carte, Inc., and he performed his duties on behalf of Smarte Carte, Inc.  A reasonable trier of fact could conclude that Grover and Spring worked for a single establishment for purposes of the EPA.

Smarte Carte also argues that Spring is not a proper comparator because his position differed from Grover's position.  A review of the record reveals that Spring and Grover were employed in similar capacities.  They were both vice presidents (albeit of different business units), they both reported to Rudis, and they had similar job responsibilities.  Indeed, their employment agreements contain nearly identical job descriptions.  (Sarnoski Decl., Ex. A at 21, Ex. C at 12.)  Thus, Grover has established a prima facie case that Spring is a proper comparator.

### 3.      Nondiscriminatory Basis for Unequal Pay

Smarte Carte has done little in its moving papers to establish that Grover's compensation was determined by factors other than gender.  Smarte Carte argues–unpersuasively–that Grover was paid the same or more than her male counterparts and that even if she was paid less, it was due to the nature of her job responsibilities rather than her gender.  Smarte Carte has fallen short of meeting its burden of providing a legitimate nondiscriminatory factor on which Grover's pay was based.  Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 683 (8th Cir. 2001).  Accordingly, Smarte Carte is not entitled to summary judgment on Grover's EPA claim.

## C.      Pay Discrimination Under Title VII

Grover alleges that Smarte Carte's failure to pay her the same amount as her male

counterparts also establishes a violation of Title VII.  The Eighth Circuit has long held

that "[w]here a claim is for unequal pay for equal work based upon sex, the standards of

the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of

Title VII."  McKee v. BiState Dev. Agency, 801 F.2d 1014, 1019 (8th Cir. 1986); see also

Drum v. Leeson Elec. Corp., 565 F.3d 1071, 1072 (8th Cir. 2009) (holding that because

Drum's allegations relate solely to unequal pay for equal work, her Title VII claim is

governed by the standards of the EPA).  For the reasons explained in the context of

Grover's EPA claim, Smarte Carte is not entitled to summary judgment on Grover's pay

discrimination claim under Title VII.

### D.    Disparate Treatment Under Title VII

Grover also bases her Title VII claim on gender discrimination relating to disparate

treatment, i.e., Smarte Carte's failure to promote her and give her additional career-

enhancing opportunities and subjecting her to offensive and derogatory comments in

meetings.  (Compl. ¶¶ 19-20.)  Smarte Carte did not move for summary judgment on this

aspect of Grover's Title VII claim.  Smarte Carte argues, however, that the Court may sua

sponte enter summary judgment on this claim.  Smarte Carte relies on Enowmbitang v.

Seagate Tech., Inc., 148 F.3d 970, 973 (8th Cir. 1998), for this proposition.  In

Enowmbitang, the court determined that the trial court properly dismissed the plaintiff's

Title VII claim sua sponte because she failed to state a claim upon which relief could be

granted.  Id.  Specifically, the court concluded that it was clear that the plaintiff had not

suffered any adverse employment action, an element required to bring a viable Title VII

claim.  <u>Id.</u>

Here, in contrast, Grover has properly stated a claim under Title VII.  She alleges

that, as a result of Smarte Carte's gender discrimination, she was denied earned

promotions and the opportunity to expand her areas of responsibility.  If her allegations

are true, Grover has suffered adverse employment action.[5]  <u>See</u> <u>Lisdahl v. Mayo Found.</u>

<u>for Med. Educ. & Research</u>, 698 F. Supp. 2d 1081, 1109 (D. Minn. 2010) (Erickson,

M.J.) ("Materially adverse actions include termination, demotion accompanied by a

decrease in pay, or a material loss of benefits or responsibilities, but do not include

everything that makes an employee unhappy.") (internal quotations omitted).  Moreover,

the Eighth Circuit has cautioned against sua sponte summary dispositions:  "It is

fundamentally unfair to the nonmoving party to require her to address issues not

addressed by the moving party in anticipation that the district court might rely on some

unidentified issue to grant the motion."  <u>Heisler v. Metro. Council</u>, 339 F.3d 622, 631 (8th

Cir. 2003).  Accordingly, the Court declines Smarte Carte's invitation to dismiss this

aspect of Grover's claim.[6]

**E.    Retaliation Under Title VII**

---

[5] It is questionable whether Grover's allegations relating to derogatory comments
rises to the level of adverse action, but the Court need not decide that issue under the
present procedural posture.

[6] Smarte Carte argues that Grover's hostile work environment claim should be
dismissed, but there does not appear to be any such claim in the Complaint.  (Def.'s Supp.
Mem. at 40-41.)  At oral argument, counsel for Grover acknowledged that Grover has not
raised a hostile work environment claim.

Grover also raises a retaliation claim under Title VII.  She alleges that she was fired in retaliation for her consistent complaints regarding her unequal pay and disparate treatment.  To establish a claim of retaliation, Grover must show:  (1) that she was engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. Sowell, 251 F.3d at 684.  There is no question that Grover's complaints of unequal and disparate treatment constitute protected activity.  There is also no question that Grover's termination was an adverse employment action.

Smarte Carte argues that the retaliation claim should be dismissed, first, because there was no causal connection between Grover's termination and her complaints of inequality and disparate treatment.  Smarte Carte contends that there was a two-year gap between Grover's last complaint and her termination.  Grover counters Smarte Carte's assertion by noting that she complained to Rudis regarding her pay and treatment on May 8, 2007, just 23 days before she was fired.[7]  (Grover Aff. ¶¶ 23-25.)  Accordingly, at a minimum there is fact dispute as to the last date of Grover's complaint.  Assuming for purposes of this Motion that Grover's assertion is credible, the question becomes whether the temporal proximity between Grover's last complaint to Rudis and her termination 23 days later is sufficient to raise an inference that her termination was retaliatory in nature.

---

[7] The record supports Grover's contention that Rudis began termination proceedings on or before May 18, 2007, just 10 days after Grover's last complaint to him. (Sarnoski Decl., Ex. H.)  Whether the adverse action was 10 days or 23 days after Grover's complaint to Rudis, the inference is the same.

18

Although "[a]n inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events,. . . in general more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson v. Scott Cnty., 406 F.3d 515, 524 (8th Cir. 2005) (internal quotations omitted), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir 2011). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1087-88 (8th Cir. 2010), abrogated on other grounds by Torgerson, 643 F.3d 1031. Here, the 23-day period between Grover's last complaint and her termination is sufficient under Eighth Circuit precedent to establish a prima facie case of retaliation. See, e.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (holding that a 14-day period between the protected activity and the plaintiff's termination was a sufficient to establish temporal connection); Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (noting that a matter of weeks between a protected activity and an adverse employment action was sufficient to complete a prima facie case of discrimination); Mathews v. Trilogy Commc'ns, Inc., 143 F.3d 1160, 1166 (8th Cir. 1998) (recognizing that a time lapse of two months between protected activity and discharge may create inference of retaliatory motive); Keys v. Lutheran Family & Children's Servs. of Mo., 668 F.2d 356, 358 (8th Cir. 1981) (determining that less than

19

two months between protected activity and adverse employment action created inference

of retaliation).

Because of the temporal proximity in this case, an inference of retaliatory motive

is appropriate.  Giving Grover the benefit of all favorable inferences, a jury could find

that Smarte Carte's decision to terminate Grover's employment was in retaliation for her

complaints of disparate treatment.

Smarte Carte also argues that the retaliation claim should be dismissed because it

terminated Grover for legitimate business reasons.  The record is unclear on this point.

Smarte Carte states that it terminated Grover as part of a reduction in force due to its dire

financial condition at the time, but fails to provide any evidence in support of that claim.

Based on the Court's review of the record, it appears that Grover may have been the only

employee terminated at that time.  At a minimum there is a factual dispute as to whether

Smarte Carte's decision to terminate Grover was based on a non-discriminatory reason.

**F.     Limitations Period**

Grover filed her charge with the EEOC on February 27, 2008 and filed the instant

action on November 19, 2009.  [Doc. 1.]  In her Complaint, Grover alleges a continued

practice of inequality beginning as early as 2002.[8]  Smarte Carte argues that the EPA's

---

[8] Smarte Carte argues that the time frame of Grover's allegations should be limited
to those beginning on February 13, 2004, the date identified in Grover's EEOC charge,
because she has failed to exhaust any claims occurring prior to that date.  Smarte Carte's
argument, even if correct, is not dispositive and thus does not affect the outcome of this
motion.

20

two-year limitations period applies and, as such, any claims Grover may have prior to

November 19, 2007 are time barred.  Smarte Carte terminated Grover in May 2007, so if

Smarte Carte is correct, Grover's EPA claim would be entirely time barred.

The EPA carries a two-year statute of limitations, 29 U.S.C. 255(a), but that period

may be extended to three years if the employee can show the employer's violation was

willful, meaning that the employer "knew or showed reckless disregard for whether its

conduct violated" the EPA.  Smith v. Heartland Auto. Servs., Inc., 418 F. Supp. 2d 1129,

1141 (D. Minn. 2006) (Kyle, J.).  Grover has demonstrated that a fact issue exists with

respect to Smarte Carte's alleged willfulness.  Specifically, Grover points to her

complaints to Rudis beginning in 2002 that she believed her pay was unequal to that of

her male counterparts.  Smarte Carte's failure to attend to those complaints could be

deemed by a fact finder to evidence willfulness.  Thus, fact issues preclude summary

judgment on the question of Smarte Carte's willfulness.

Smarte Carte's statute of limitations argument as to Grover's Title VII claims

likewise fails.  Under Title VII, a discrimination charge must be filed with the EEOC

within 300 days of the alleged discrimination.  42 U.S.C. § 2000e-5(e)(3)(A).  Grover met

this standard by filing her EEOC claim on February 27, 2008, less than 300 days after her

termination.  In cases of alleged continuing violations, as in this case, a claim will be

timely as long as one act of discrimination occurred within that 300-day period.

Moreover, under the "continuing violation" theory, the conduct underlying Grover's

claims are not curtailed by the limitations period.  "Conduct which occurred more than

21

300 days before the date of filing cannot be grounds for a suit unless it is part of a continuing violation which is systemic or serial." Klein v. McGown, 198 F.3d 705, 709 (8th Cir. 1999) (citing Kimzey v. WalMart Stores, Inc., 107F.3d 568, 572-73 (8th Cir. 1997)).  To meet this standard, Grover must demonstrate that some incident of discrimination occurred within the 300-day limitations period, and that there is a nexus between that incident and the other instances of discrimination.  Klein, 198 F.3d at 709.

As discussed above, Grover has met this standard by presenting evidence that would support a finding that Smarte Carte engaged in a longstanding pattern of discrimination.  Smarte Carte's limitations arguments do not support a determination that summary judgment is appropriate.

## III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 15] is **DENIED**.


Dated:   Dec. 22, 2011                                    Susan Richard Nelson
                                                         SUSAN RICHARD NELSON
                                                         United States District Judge